## McLean vs. Dow and others.

*Estoppel* in pais.

If chattel mortgagees, or their agent, knowing that the mortgagors are endeavoring to obtain a loan of money on the property, to pay a bill of freight for which it is held, conceal the existence of the mortgage for the express purpose of enabling the mortgagors to obtain such loan, they are *estopped* from setting up the mortgage against one who, being ignorant of its existence, and being thus intentionally kept ignorant thereof, advances the money to pay the freight, on the security of the property and on the faith that it is unincumbered. And it is immaterial, in such a case, that the mortgagees, or their agent, did not know that the mortgagors were applying for a loan to the particular person from whom such loan was obtained.

APPEAL from the Circuit Court for *St. Croix* County.

Replevin, for a threshing machine, engine and appurtenances. The property in controversy was sold by the defendants, who were the manufacturers thereof, to Hissong, Cremis, and Seeley, and the purchasers executed to the defendants a chattel mortgage thereon to secure the payment of a part of the purchase money. The sale was made and the mortgage executed in the state of Indiana, and the mortgage was duly recorded as required by the statute of that state, to protect

the lien of the defendants by virtue thereof. A portion of the mortgage debt remains unpaid.

After the whole debt became due, the mortgagors, or some of them, shipped the property to Wilson's Station, in St. Croix county, in this state. In April or May, 1875, an agent of the defendants found the property in the custody of the agent of the railroad company, by whom it was held for non-payment of the freight thereon. The defendants' agent was a witness on the trial, and, on his cross examination, testified concerning his proceedings when he found the machine, as follows:

" When I came up here in April or May, I found this machine at Wilson's Station, and took possession of it for the defendants in this case.

" Q. What possession did you take?

" A. I placed my mortgage — I had the mortgage, and I took it on the mortgage. I didn't move it. I placed the mortgage in the hands of Mr. Cowan, a justice of the peace there. Mr. Hissong was not there; he was in Indiana at the time, so I understood; I notified no one then; I took possession by virtue of my mortgage, and put it in the hands of Mr. Cowan.

" Q. Didn't you tell Mr. Cowan not to take possession, and not to let on that he had that mortgage at all, until after the freight was paid?

" A. There was something of that kind; I wanted the freight to be paid on that.

" Q. Your taking possession of that thresher was simply to give your chattel mortgage to Mr. Cowan, and to tell him to keep still about it, and not to mention it to anybody until after the freight was paid, and then take it off to Indiana as quick as possible?

" A. Well, I understood, by the freight agent there, that Mr. Cremis was trying to get the money to pay the freight on that machine; I didn't know where he was going to get it;

I didn't understand that he was trying to borrow it of the agent and give a mortgage on the machine; I don't remember any conversation of that kind. I should think I would remember it, if it took place. He didn't tell me that Mr. Hissong had been there trying to borrow money, and to give a mortgage on that machine; I did not know what security Mr. Cremis was trying to give; he said he was there trying to borrow the money to pay that freight; he told me, also, that there was some 'shenannigan' about the machine, and he thought he could not borrow the money on the machine.

"Q. Then you knew that they were trying to borrow money on that machine, and that they could not do it because somebody thought there was some 'shenannigan' about it?

"A. I am not sure but there was something of that kind said. That does not account for my direction to Mr. Cowan that he should keep perfectly still about that machine; the reason that I did not want anything said about it, was, because if they found out I was up there after that machine, they wouldn't pay the freight. Mr. Van Vliet said that they were trying to get the money to pay the freight.

"Q. And mortgage the machine?

"A. I don't know but he did say something of that kind.

"Q. And in the face and eyes of that you told Mr. Cowan not to say anything about it — not to let anybody know that he had authority to take that machine, until that freight was paid?

"A. I told him not to let Mr. Cremis know it; Mr. Cremis knew I had a mortgage on the machine; I told him not to let anybody else know. He had $150 freight on it, and he had it away off up here in the country; I wanted Mr. Cremis to pay his own freights — to pay the costs he had made on it. I think the freight bill was something like $150."

In the latter part of August, 1875, the property still being held by the railroad company, the plaintiff, without actual notice of the defendants' mortgage, loaned Hissong $175, with

which to pay the freight; and the latter executed to the plaintiff a mortgage on the same property to secure the payment of such loan and another demand which the plaintiff held against him. This mortgage was duly filed in the office of the proper town clerk. Hissong paid the freight with the money thus loaned to him by the plaintiff, and removed the property from the depot. The mortgage debt not being paid at maturity, the plaintiff took the property, and duly sold it at public sale under the mortgage. The plaintiff bid in the property at such sale, and stored it in a barn until he should desire to use it; and the defendants afterwards took it from the barn without the consent or knowledge of the plaintiff, claiming it by virtue of their mortgage. Thereupon the plaintiff brought this action to recover the property, and damages for its detention.

After the evidence was all in, the jury, by direction of the judge, returned a verdict for the defendants. A new trial was denied, and judgment entered pursuant to the verdict; and plaintiff appealed from the judgment.

For the appellant, a brief was filed by *E. B. Manwaring*, and the cause was argued orally by *F. J. McLean*. On the subject of estoppel they cited *Pickard v. Sears*, 6 Ad. & El., 469; *Gregg v. Wells*, 10 id., 90; *Dezell v. Odell*, 3 Hill, 224; *Horn v. Cole*, 51 N. H., 296; *Drew v. Kimball*, 43 id., 285; *Thompson v. Blanchard*, 4 Coms., 303; Bigelow on Est., 442, 487, note 1. To the point that the misrepresentations which create an estoppel need not be made with a view of influencing the action of *any particular person*, they cited specially the two cases from New Hampshire, *supra*.

For the respondents, a brief was filed by *Henry C. Baker* and *John C. Spooner*, and the cause was argued orally by *Mr. Spooner*. They argued that an estoppel of the kind here claimed is in the nature of a *penalty;* that it cannot rest upon mere inference or suspicion, but the facts out of which it is claimed to arise must be clearly proven, and must involve

some degree of turpitude (*Henshaw v. Bissell*, 18 Wall., 271); that the desire of the agent that the mortgagors should pay the freight charges which they had wrongfully created, was legitimate, and his silence with a view to that result natural and proper (*Brinckerhoff v. Lansing*, 4 Johns. Ch., 72); and that the evidence entirely failed to show knowledge on the agent's part that the mortgagees were endeavoring to raise money *on the machine* to pay the freight.

LYON, J. It seems too clear for argument or doubt, that if the agent of the defendants knew, when he found the property in controversy at the depot at Wilson's Station, that the mortgagors were endeavoring to obtain a loan of money on the property, with which to pay the freight, and concealed the fact of the existence of the Indiana mortgage for the express purpose of enabling the mortgagors to obtain such loan, the defendants are estopped from setting up their mortgage against one who, being ignorant of its existence, and being thus intentionally kept ignorant of its existence, advanced the money to pay the freight on the faith that the property was unincumbered and on the security of the property. Such a case is within the rule, that one who does not speak when justice and fair dealing require him to do so, shall not be allowed to speak afterwards, to the prejudice of another who has been misled by his silence. And the case is much stronger where a person employs means, other than mere silence, to conceal the knowledge of a fact from one who proposes to act on the belief of its nonexistence, for the purpose of inducing such action.

This principle in the law of estoppel is elementary, and the books abound in cases in which it has been applied and enforced. The principle was stated by the late Mr. Justice PAINE in *Vilas v. Mason*, 25 Wis., 310, as follows: " Where an owner of property stands by and sees a third party sell it as his own, without asserting his own title or giving the pur-

chaser any notice of it, he is estopped, as against such pur-
chaser, from asserting it afterwards." p. 332.    See authorities
cited in brief of counsel for the plaintiff.

The testimony of the defendant's agent tends to show that
he knew the mortgagors were seeking to borrow money on the
security of the property with which to pay the freight; and
that, for the purpose of enabling the mortgagors to effect such
loan, he intentionally concealed the fact of the existence of
their mortgage, as well as the fact that he had been at Wil-
son's Station at all.    We do not say that those facts are
proved, but only that the testimony tends to prove them.
And because it so tends, the questions of fact upon which the
estoppel depends should have been submitted to the jury,
under proper instructions.

It is scarcely necessary to remark that it is quite immate-
rial that the agent of the defendants did not know that the
mortgagors were seeking a loan from the plaintiff.    It is suffi-
cient if the agent knew that they were in the market for a
loan wherever they could obtain it, on the security of the
property.    Acts of estoppel *in pais*, under such circum-
stances, are just as available to the plaintiff as the same acts
would have been had the agent known that the mortgagors
were negotiating for the loan with the plaintiff.    See cases on
this point cited on behalf of the plaintiff.

Other questions were discussed in the arguments; but we
find it unnecessary to pass upon them.

*By the Court.* — The judgment is reversed, and the cause
remanded for a new trial.